# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COREY WILLIAMS,<br><br>    Plaintiff,<br><br>v.<br><br>DeLEON et al.,<br><br>    Defendants. | Case No. 1:15-cv-00543-SKO (PC)<br><br>**ORDER GRANTING DEFENDANTS'**<br>**MOTION FOR SUMMMARY JUDGMENT**<br><br>**(Doc. 38)** |

## **INTRODUCTION**

    Plaintiff, Corey Williams, is a civil detainee at Coalinga State Hospital ("CSH") pursuant to California's Sexually Violent Predator Act contained within Welfare & Institution Code sections 6600 et seq. ("SVPA"). Plaintiff is proceeding *pro se* and *in forma pauperis* in this action on allegations that Defendants, Christopher DeLeon, Ian Young, Wendy Perez, and Kenneth Underwood subjected him to conditions of confinement that violated his substantive due process rights under the Eighth and Fourteenth Amendments.

    On February 26, 2018, Defendants filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure,[1] contending that Plaintiff cannot establish a triable issue on the merits of his claims. Plaintiff filed an opposition (Doc. 40),[2] and Defendants did not

---

[1] The Federal Rules of Civil Procedure will be referred to as "Rule *." Any reference to other statutory authorities shall so indicate.

[2] Plaintiff was provided with contemporaneous notice of the requirements for opposing a motion for summary judgment with Defendants' moving papers as well as by separate order from this Court. *Stratton v. Buck*, 697 F.3d 1004, 1008 (9th Cir. 2012); *Woods v. Carey*, 684 F.3d 934, 939-41 (9th Cir. 2012); *Rand v. Rowland*, 154 F.3d 952,

1

file a reply. The motion is deemed submitted. L.R. 230(*l*). As discussed below, Defendants' motion is granted.

## **SUMMARY JUDGMENT STANDARDS**

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Washington Mutual Inc. v. U.S.,* 636 F.3d 1207, 1216 (9th Cir. 2011). An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.,* 818 F.2d 1422, 1436 (9th Cir. 1987). The Court determines only whether there is a genuine issue for trial and in doing so, it must liberally construe Plaintiff's filings because he is a *pro se* prisoner. *Thomas v. Ponder*, 611 F3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

Rule 56 allows a court to grant summary adjudication, or partial summary judgment, when there is no genuine issue of material fact as to a claim or portion of that claim. Fed. R. Civ. P. 56(a); *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . .") (internal quotation marks and citation omitted). The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same. *See* Fed. R. Civ. P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F.Supp.2d 1192, 1200 (S.D. Cal. 1998).

Each party's position must be supported by (1) citing to particular portions of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified School Dist*., 237 F.3d 1026, 1031 (9th Cir. 2001); *accord Simmons v. Navajo*

---

960-61 (9th Cir. 1998). (Docs. 38, 39.)

*County, Ariz.,* 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendants do not bear the burden of proof at trial and, in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If Defendants meet their initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp.,* 627 F.3d at 387 (citing *Celotex Corp.,* 477 U.S. at 323). This requires Plaintiff to "show more than the mere existence of a scintilla of evidence." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).

In judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence, *Soremekun v. Thrifty Payless Inc.,* 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted), *cert. denied*, 132 S.Ct. 1566 (2012). The Court determines only whether there is a genuine issue for trial and in doing so, it must liberally construe Plaintiff's filings because he is a *pro se* prisoner. *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

## FINDINGS

### A. Legal Standards

As a civil detainee, Plaintiff is entitled to treatment more considerate than that afforded convicted criminals. *Jones v. Blanas*, 393 F.3d 918, 931-32 (9th Cir. 2004). Plaintiff's right to

3

constitutionally adequate conditions of confinement is protected by the substantive component of the Due Process Clause of the Fourteenth Amendment. *Youngberg v. Romeo*, 457 U.S. 307, 315 (1982). However, civil detainees are not free persons with "full civil rights," *Seaton v. Mayberg*, 610 F.3d 530, 535 (9th Cir. 2010), and it is well-established that effective institutional management is a legitimate, non-punitive governmental interest, *Jones*, 393 F.3d at 932. The Eighth Amendment provides "a minimum standard of care" for determining the rights of pretrial detainees. *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1120 (9th Cir.2003), quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). Thus, a civil detainee's claim that meets the requirements under the Eighth Amendment also meets the requirements under the Due Process Clause of the Fourteenth Amendment.

Plaintiff is civilly detained at CSH, and as a result, some curtailment of his rights is to be expected. *See Overton v. Bazzetta*, 539 U.S. 126, 131 (2003). Within the context of civil commitment, patients' substantive rights include: adequate food, shelter, clothing, medical care, safety and freedom from unnecessary bodily restraint, as well as "minimally adequate or reasonable training to ensure safety and freedom from undue [physical] restraint." *Youngberg v. Romeo*, 457 U.S. 307, 315-16, 319 (1982). "Food is one of life's basic necessities," and the government is obligated to provide those in its custody "with adequate sustenance on a daily basis." *Foster v. Runnels*, 554 F.3d 807, 812-14 (9th Cir. 2009) (denial of 16 meals in 23 days which caused dizziness and headaches was a sufficiently serious deprivation within the meaning of the Eighth Amendment); *see also Jones*, 393 F.3d at 931-32 (civil detainees entitled to more considerate treatment than convicted criminals). Adequate food is a basic human need protected by the Eighth Amendment. *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982), (abrogated on other grounds by *Sandin v. O'Connor,* 515 U.S. 472 (1995)). While prison food need not be "tasty or aesthetically pleasing," it must be "adequate to maintain health." *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993).

Sustained deprivation of food that results in pain without any penological purpose can amount to cruel and unusual punishment. *Phelps v. Kapnolas*, 308 F.3d 180, 187 (2d Cir.2002). "In the same way that an inmate relies on prison officials to provide appropriate medical care, *see*

*Estelle v. Gamble*, 429 U.S. 97 (1976), and protection from assaults by other inmates, *see Farmer v. Brennan*, 511 U.S. 825 (1994), inmates rely on prison officials to provide them with adequate sustenance on a daily basis. The repeated and unjustified failure to do so amounts to a serious depravation." *Foster*, 554 F.3d at 814.

B. **Plaintiff's Claims**

This action proceeds on Plaintiff's First Amended Complaint ("FAC") (Doc. 7) for Defendants' alleged violation of Plaintiff's substantive due process rights. Plaintiff's claims arise from a policy, implemented on March 5, 2015, that required diabetic detainees such as Plaintiff to submit to blood glucose level testing before meals. If a detainee failed to submit to the testing, he was allegedly denied the meal that was being served.

Plaintiff alleged that because he declined to submit to glucose testing, he was denied meals from the evening meal of March 5, 2015, until the breakfast meal of March 11, 2015. This was found to state a cognizable claim under the Due Process Clause and the Eighth Amendment against Defendants DeLeon, Perez, and Underwood who acknowledged problems with the policy, but refused to provide Plaintiff meals when he declined to submit to glucose testing; and against Defendant Young for implementing the policy and failing to ensure that staff no longer followed the policy upon realizing that it violated detainees' rights. (Docs. 33, 34.)

C. **Defendants' Evidence[3]**

Defendants contend they are entitled to judgment as a matter of law because Williams' inability to obtain cold sack meals was not objectively sufficiently serious to amount to a due process violation, and they lacked the subjective intent to punish him. Defendants' evidence shows that although the blood-sugar testing was required before he could receive a cold sack meal, it was not required for Plaintiff to receive a meal at the Patient Dining Room ("PDR"). Meals at the PDR were always available to Plaintiff upon presenting his identification ("ID") card. Plaintiff only went without meals from the PDR when he chose not to present his ID card.

//

---

[3] Disputed facts shown by Plaintiff's evidence are delineated in the discussion of his opposition.

5

### 1. Plaintiff's Background and Health History

Defendants' evidence shows that Williams was diagnosed with Type 2 diabetes approximately fifteen years ago. (Defendants' Statement of Undisputed Fact "SUF" 3.) On March 5, 2015, Williams' doctor at CSH issued orders including a "heart healthy no pork diet," checking blood-sugar and administering insulin three times a day within 30 minutes before breakfast, lunch, and dinner for 45 days. (SUF 4.) The amount of insulin required to be administered was dependent on his blood-sugar level. (*Id.*) Williams testified that a failure to take insulin would "probably kill him." (SUF 5.) Williams also stated that his blood-sugar level was usually higher than average and he was supposed to watch his food intake. (SUF 6.) When his blood-sugar was high, Williams experienced symptoms including dry mouth and frequent urination. (SUF 7.) When his blood-sugar was low, Williams experienced low energy and shakes. (SUF 8.)

### 2. Food Policies and Setup at CSH

CSH provides meals for patients at the PDR. (SUF 9.) The PDR serves three meals a day to Unit 8 patients at 7:40 a.m., 12:30 p.m., and 5:40 p.m., seven days a week. (SUF 10.) To account for meals and ensure that appropriate diet requirements are met (as medically ordered), patients are required to display their ID card in the PDR when requesting meals during breakfast, lunch, and dinner. (SUF 11.) Showing an ID card also ensures that patients are not subjected to dietary, allergy and choking risks. (*Id.*) No purchase is required. (*Id.*) The PDR offers several CSH approved diets, including a heart healthy diet which promotes heart health. (SUF 12.)

Sack meals are only provided on the unit in certain cases. To receive a sack meal, an RN must assess and document justification for receiving it. (SUF 13.) CSH also has a canteen and grill called "the Union Square." (SUF 14.) The primary purpose of the Union Square is to provide a place to purchase food and personal care items. (*Id.*) It serves snacks and meals like burritos, cheeseburgers, chicken, and eggs. (*Id.*) It is in the same building as the PDR and is open 6 days a week from 9 a.m. to approximately 7 p.m. (*Id.*)

/ / /

/ /

### 3. Allegations Against Defendants

#### a. Kenneth Underwood

Underwood was employed as a psychiatric technician at CSH in Unit 8 in March 2015. (SUF 15.) On March 5, 2015, Williams went to the PDR at lunchtime and did not receive a meal because he did not bring and show his hospital ID. (SUF 16.) Williams went to the nursing station at Unit 8 to obtain a cold sack meal, knocked on the door, and Underwood answered. (SUF 17.) Underwood asked Williams if he had completed his blood-sugar level check. (*Id.*) Williams refused to have his blood-sugar level tested and walked away. (*Id.*) This sequence of events occurred again at lunchtime on March 7, 2017. (SUF 18.)

#### b. Christopher DeLeon

DeLeon was employed as a psychiatric technician at CSH in Unit 8 in March 2015. (SUF 19.) On March 5, 2015 during dinnertime, Williams went to the PDR at dinnertime and did not receive a meal because he again failed to bring and show his hospital ID. (SUF 20.) Williams went to the nursing station at Unit 8 to obtain a cold sack meal, knocked on the door, and DeLeon answered. (SUF 21.) DeLeon asked Williams if he had completed his blood-sugar level check. Williams refused to do so and walked away. (*Id.*) This sequence of events recurred at dinnertime on both March 6, 2015, and March 8, 2015. (*Id.*) On March 9, 2015 at lunchtime, Williams did not go to the PDR for dinner. (SUF 23.) Williams went to the nursing station and asked for a cold sack meal. DeLeon asked Williams to check his blood-sugar, but Williams refused. (*Id.*)

#### c. Wendy Perez

Perez was employed as a psychiatric technician at CSH in Unit 8 in March of 2015. (SUF 15, 24.) On March 7, 2015, at dinnertime, Williams went to the nursing station at Unit 8 to obtain a cold sack meal and Perez answered. (SUF 25.) Perez asked Williams if he had completed his blood-sugar level check. (SUF 26.) Williams refused to comply with the blood-sugar level test requirement. (*Id.*) This sequence of events recurred at dinnertime on March 10, 2015. (SUF 27.)

///
//
//

####      d.    Ian Young

Young was employed as a unit supervisor at CSH in Unit 8 in March 2015. (SUF 28.) On March 10, 2015 in the morning, Young told Williams that the meal issue had been resolved. (SUF 29.)

### D.    **Defendants' Argument**

#### 1.    **Objective Element**

##### a.    **Plaintiff's Access to Food**

Defendants argue that although Williams claims he was denied cold sack meals for a week, Williams was never deprived of food, and cannot set forth an action by any of the Defendants that arises to the level of a constitutional violation. (Doc. 38, pp. 12-16.)[4]

Defendants contend that Plaintiff's alleged denial of cold sack meals for a week was not "sufficiently serious" to meet the objective component of his claims. (*Id.*, (citing *Wilson v. Seiter*, 501 U.S. 294 (1991)).) Objectively, Defendants argue, "[w]hether the deprivation of food falls below this [constitutional] threshold depends on the amount and duration of the deprivation." *Berry v. Brady*, 192 F.3d 504, 507 (5th Cir.1999) (quoting *Talib v. Gilley*, 138 F.3d 211, 214 n. 3 (5th Cir. 1998)). As the Supreme Court emphasized, "the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. A filthy, overcrowded cell and a diet of 'gruel' [providing 1000 calories a day] might be tolerable for a few days and intolerably cruel for weeks or months." *Hutto v. Finney*, 437 U.S. 678, 686-87 (1978).

Defendants contend that the alleged denial of cold sack meals for a week was not sufficiently serious because the evidence reveals that Williams was never deprived of food and ate throughout the time-period in question. (Doc. 38, p. 12.) Defendants' evidence reveals that although Plaintiff did not receive sack meals from March 5, 2015, to March 10, 2015, staff at CSH observed Williams consistently eating.

Specifically, on March 5, 2015, at 11:15 a.m. and 2:35 p.m. respectively, the psychiatric technicians noted that Williams ate cake and his entire breakfast. (SUF 30.) On March 6, 2015,

---

[4] All references to pages of specific documents pertain to those set forth on the upper-right corners as a result of the CM/ECF electronic court docketing system.

at 12:40 p.m., staff noted that Williams had grilled food in his dorm room. (SUF 31.) On March 8, 2015, at 11 p.m., Williams was seen eating chips and noodles, and a sack lunch was provided but not picked up. (SUF 32.) On March 9, 2015, at 10 p.m., Williams was observed eating in the dayroom. (SUF 33.) Williams also testified at his deposition that he probably ate from the canteen on that day. (SUF 34.) On March 10, 2015 at 6:30 a.m., Williams was seen sharing food with peers in the dayroom, including a large bag of chips, two ramen noodle packs, tortillas, and a spread. (SUF 35.) The registered dietician also noted at 12:30 p.m. that Williams consumed other food items beside sack meals, including cereal, pasta and items available for purchase at the canteen. (SUF 36.) On March 10, 2015, at 2:20 p.m., staff noted that Williams had a lunch sack. (SUF 37.) Williams testified at his deposition that on March 11, 2015, he probably went for breakfast at the PDR, and probably ate other food as well that he purchased on his own. (SUF 38.) Defendants contend this evidence shows Williams was never actually deprived of food throughout that week, regardless of whether he received cold sack meals.

### b. Availability of Food

Defendants also contend that Williams' due process claim is not sufficiently serious because the evidence shows Williams always had access to regular meals and alternative food options at CSH. (Doc. 38, pp. 13-14.) Although Williams alleges he could not obtain cold sack meals, Defendants present evidence which shows he was free to eat at the PDR, which is the main location where meals are served daily to patients at CSH. (SUF 10.) The PDR also offered a special diet (the "heart healthy no pork diet") which Williams' nurse practitioner had ordered for him. (SUF 4, 12.) Williams simply needed to show his ID to receive a meal at the PDR. (SUF 11.)

Williams could have obtained meals at the PDR throughout the week he asked for cold sack meals, but he refused to comply with the CSH policy which required patients to show their IDs. (SUF 16, 18, 20, 22, 25, 27.) Defendants contend that the Constitution does not protect decisions by SVPs not to comply with valid hospital policies which result in a failure to obtain meals offered to them. Defendants correctly cite *Talib v. Gilley* for the proposition that no Eight Amendment violation exists when prison officials did not serve meals to an inmate who failed to

comply with prison regulations requiring him to kneel before the meal was served. *Talib*, 138 F.3d at 215. The court stated, "[g]iven the ease with which *Talib* could have complied with reasonable prison regulations, he in a very real sense 'carrie[d] the keys' to the kitchen cupboard. *See Uphaus v. Wyman*, 360 U.S. 72, 81 (1959). He chose not to unlock it, and it is not for the federal courts to intervene in his personal decision." *Id*. at 216.

Defendants correctly contend that Williams' situation is analogous to *Talib*. Williams testified at his deposition that he was free to go to the PDR whenever he wanted and it was up to him whether to go. (SUF 39.) According to the psychiatric technicians' notes, Williams did not show up at the PDR for lunch or breakfast on March 6, 2015, and March 9, 2015. (SUF 40.) Williams also testified that when he went to the PDR, the only reason he was not able to obtain a meal was his refusal to show his ID; the PDR staff never asked him to do a blood-sugar level check. (SUF 41.) However, Plaintiff did not bring his ID with him to the PDR, and refused whenever the servers asked him to show his ID. (SUF 42.) The psychiatric technicians' notes also reflect that Williams refused to show his ID at the PDR on March 5, 2015, March 8, 2015, and March 10, 2015. (SUF 43.) Defendants' evidence therefore shows that Williams always had access to meals (without being required to submit to blood-sugar level testing) at the PDR, but he simply chose not to comply with hospital procedures to obtain food there. Defendants' evidence also reveals that Williams' refusal was solely based on his personal belief that he should not be required to show his ID to obtain food. (SUF 44.)

Defendants correctly contend that Williams was not justified in refusing to comply with the hospital's policy which required showing an ID at the PDR. The policy was reasonably related to a legitimate government aim—its stated intent was to account for meals and ensure appropriate diet requirements were met, as medically ordered. (SUF 11.) Showing an ID also ensured that patients were not subjected to dietary, allergy, and choking risks. (*Id*.) Defendants contend Williams' claim that he was completely deprived of meals as a result of Defendants' actions is meritless, because food was always available to him at the PDR.

Defendants' evidence also shows that in addition to the meals served at the PDR, meals and snacks were also available for purchase at the canteen and grill. (SUF 14.) During the week

Williams was allegedly denied cold sack meals, Williams was employed at CSH and earned a monthly income. (SUF 2.) Thus, Williams could have purchased food at the canteen or grill (open six days a week) where he was not required to show his ID or do a blood-sugar level check. Williams was also able to buy food online, and testified that he had done so in the past, and kept items like chips and cereal in his dorm room. (SUF 45.) Defendants correctly contend that cold sack meals were not Williams' only source of food and, given the various food options available to Williams at CSH, it is clear he was not deprived of food in violation of the Due Process Clause.

### c. Harm or Adverse Health Effects

Defendants also contend Williams cannot show he suffered any harm or adverse effects to his health as a result of not receiving cold sack meals from the evening meal of March 5, 2015, until the breakfast meal of March 11, 2015. Defendants' evidence reveals that Williams generally stated he could feel symptoms of either high or low blood-sugar levels. (SUF 7-8.) However, Williams testified that from March 5, 2015, to March 10, 2015, he did not feel the effects of any physical symptoms of abnormal blood-sugar levels, or of not taking insulin, despite not eating cold sack meals. (SUF 46.)

Additionally, Defendants' evidence (staff notes) show that Plaintiff did not experience adverse health symptoms during that week. On March 5, 2015, at 7:15 p.m., a nurse noted that Williams denied any issues, pain, discomfort, or signs and symptoms of hyperglycemia. (SUF 47.) On March 6, 2015, a staff member reported at 5:35 p.m. that Williams was not showing signs of distress or hyperglycemia/hypoglycemia, and a nurse noted at 9:10 p.m. that Williams denied any pain. (SUF 48.) On March 7, 2015, at 8:45 p.m., the nurse wrote that Williams did not have signs of acute distress or symptoms of hyper/hypoglycemia. (SUF 49.) On March 9, 2015, at 11:30 a.m., a nurse observed that Williams was not in visual distress. (SUF 50.) On March 10, 2015, a staff member wrote at 6:30 a.m. that no issues were voiced or noted, and a nurse noted at 8:02 p.m. that there were no signs of distress. (SUF 51.) On March 11, 2015, at 1 p.m., a nurse noted that Williams did not show signs of respiratory distress, or shortness of breath (SOB)/confusion/decreased LOC (level of consciousness). (SUF 52.) Taking both Williams' testimony and the notes of the staff observing Williams into account, Defendants correctly

contend that Williams' failure to obtain cold sack meals from Defendants did not adversely affect his health or diabetes in violation of the Due Process Clause.

### 2. Subjective Element

Defendants' contend their actions do not amount to punishment in violation of the Due Process Clause because they did not intend to punish Williams, but rather acted with the objectively legitimate purpose to manage his high blood-sugar level and health. (Doc. 38, 16-18.)

#### a. Rational Behind Pre-Meal Blood-Sugar Checks

Defendants' evidence reveals that on March 5, 2015, Williams' doctor ordered that his blood-sugar levels to be checked before meals three times a day. (SUF 4.) That same morning, Williams' blood-sugar level was 515 mg/dl as result of eating cake. (SUF 53.) Due to Williams' high blood-sugar level, the physician was called and Williams was given insulin. (SUF 54.) That evening, at 7:00 p.m., Defendant DeLeon noted telling Williams that his blood-sugar ought "to be checked to make sure the food doesn't complicate your current health." (SUF 55.) Defendants' evidence also shows that other staff who were not named as defendants noted encouraging Williams to follow his prescribed diet, to avoid eating processed food, and to continue eating to avoid developing diabetes complications. (*See* Wilson Decl., Exh. B, Interdisc. Notes, March 5, 2015 at 7:30 p.m. & 9 p.m.; March 5, 2015 at 4:26 p.m.)

Defendants' evidence also shows that from March 5, 2015, to March 10, 2015, Defendants DeLeon, Perez, and Underwood asked Williams to do blood-sugar level checks to ensure that his blood-sugar would not rise to a dangerous level as a result of eating the cold sack meal. (SUF 56.) As psychiatric technicians, it was within the scope of their job duties to administer medications and to encourage Williams to comply with his physician's orders to check his blood-sugar level before meals. (SUF 56.) Williams nonetheless refused to check his blood-sugar levels or take insulin. (SUF 58.) Defendants DeLeon, Perez, and Underwood did not intend to deprive Williams of meals or nourishment, or to punish Williams by asking him to check his blood-sugar level. (SUF 59.) They instead acted with the legitimate, non-punitive objective of trying to manage Williams' high blood-sugar level (consistent with his doctor's orders) to maintain his health. Similarly, Defendant Young did not intend for any of the psychiatric

technicians in his unit to deprive Williams of meals or to punish him. (*Id.*)

### b. Pre-Meal Blood-Sugar Checks

Defendants further contend that requiring Williams to do a blood-sugar level check before meals was not excessive for the objective of managing Williams' diabetes and health. Because Williams refused to check his blood-sugar levels, take insulin, and show his ID at the PDR to obtain meals (where a special heart healthy diet had been ordered for him), it was reasonable for Defendants to ask him to do a blood-sugar level test before receiving a cold sack meal. (SUF 4, 16, 18, 20, 22, 25, 27.) The cold sack meals consisted of a sandwich and fruit cup, and had not been adjusted to comport with a diabetic diet. (SUF 13.) Defendants were aware from the records that Williams had a high blood-sugar level on March 5, 2015, and that his physician had ordered him to have his blood-sugar level checks before each meal. (SUF 53.) They therefore asked him whether he had checked his blood-sugar level to ensure that eating a non-diabetic, cold sack meal would not elevate his blood-sugar to a dangerously high level. (SUF 56.) Taking into account Williams' health history of diabetes, his high blood-sugar level, and the doctor's orders, Defendants contend it was neither excessive, nor arbitrary, to ask Williams to do a blood-sugar level check before receiving a cold sack meal. (SUF 4.) Defendants contend that this evidence establishes that their actions were reasonably related to their objective of managing Williams' health.

Defendants also contend they are entitled to summary judgment because Plaintiff cannot prove the subjective element. This argument is misplaced. While a subjective element was historically required for claims such as Williams raises here, this is no longer the case. The substantive component of the Due Process Clause protects civil detainees from unconstitutional conditions of confinement. *Youngberg v. Romeo*, 457 U.S. 307, 315 (1982). To establish a violation of duty under the Due Process Clause, a civil detainee need only show that a prison official purposely or knowingly subjected him to a risk of serious harm that was objectively unreasonable and need not show the defendant's subjective state of mind. *Castro*, at 1068-70 (citing *Kingsley v. Hendrickson*, --- U.S. ---, 135 S.Ct. 2466, 2472-73 (2015)). "[T]he test to be applied under *Kingsley* must require a pretrial detainee who asserts a due process claim for failure

to protect to prove more than negligence but less than subjective intent -- something akin to reckless disregard." *Castro*, at 1071. The elements of a pretrial detainee's Fourteenth Amendment claim against an individual officer are:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved -- making the consequences of the defendant's conduct obvious; and
>
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Castro*, at 1071. "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[ ] on the "facts and circumstances of each particular case." ' " *Id.*, (quoting *Kingsley*, 135 S.Ct. at 2473 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (*ref.* Restatement (Second) of Torts § 500 cmt. a (Am. Law Inst. 2016) (recognizing that "reckless disregard" may be shown by an objective standard under which an individual "is held to the realization of the aggravated risk which a reasonable [person] in his place would have, although he does not himself have it")).

While there is no longer a subjective element to claims brought by civil detainees under the Due Process Clause, Defendants motion shows a lack evidence for the second and fourth elements of Williams' claim. The conditions of which Plaintiff complains—not receiving a cold sack meal from the evening of March 5, 2012 through the morning of March 11, 2012—did not put Williams at substantial risk of suffering serious harm and did not cause injury.

The Court finds that the foregoing suffices to meet Defendants' burden to demonstrate the absence of evidence to support Plaintiff's case. *In re Oracle*, 627 F.3d at 387. The burden therefore shifts to Plaintiff to establish that a genuine issue as to any material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Plaintiff may not rely upon the mere allegations or denials of his pleadings; he is required to present evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of his

contention that the dispute exists.  Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11; *First Nat'l Bank,* 391 U.S. at 289; *Strong v. France*, 474 F.2d 747, 749 (9th Cir. 1973).

### D. <u>Plaintiff's Opposition</u>

#### 1. **Right to Refuse Medical Treatment**

Williams contends that the policy requiring him to submit to blood-sugar checks to receive a cold sack meal violated his right to refuse medical treatment.  (Doc. 40, p. 2.)  Williams contends that his right to refuse medical treatment trumps the state's legitimate interest in managing his diabetes.  (*Id.*)  Williams contends that Defendants punished him for invoking his right to refuse medical treatment by withholding food when he refused to submit to blood-sugar testing.  (*Id.*, p. 5.)

The Fourteenth Amendment protects the right to refuse unwanted medical treatment.  *See Cruzan by Cruzan v. Dir., Mo. Dept. of Health*, 497 U.S. 261, 278 (1990) (A "competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment.").  To determine whether Plaintiff's right to refuse treatment was violated, the Court must balance Plaintiff's "liberty interests against the relevant state interests."  *Cruzan*, 497 U.S. at 279.  Specifically, the Court must consider "the need for the government action in question, the relationship between the need and the action, the extent of harm inflicted, and whether the action was taken in good faith or for the purpose of causing harm."  *Plumeau v. Sch. Dist. No. 40*, 130 F.3d 432, 438 (9th Cir.1997) (quotation omitted); *see also Jacobson v. Massachusetts*, 197 U.S. 11, 24-30 (1905) (Court balanced an individual's liberty interest in declining an unwanted smallpox vaccine against the State's interest in preventing the disease).  In the prison context, "'[p]rison administrators have not only an interest in ensuring the safety of prison staff and administrative personnel . . . but also the duty to take reasonable measures for the prisoners' own safety."  *Washington v. Harper*, 494 U.S. 210, 223 (1990) (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

Williams presents neither arguments, nor evidence to address any of the *Plumeau* factors.  Instead, Williams simply contends that his right to refuse medical treatment takes precedence over Defendants' legitimate purpose of monitoring his blood-sugar levels for the appropriate care

and treatment of his diabetes. Williams generally states that Defendants' "legitimate interest in this matter fails where Plaintiff's right to refuse begins." (Doc. 40, p. 2.) Williams provides no legal authority for such a conclusory statement, and the Court finds none.

Likewise, Plaintiff provides no authority to support his statement that he "need only show that he was exposed to a serious risk of harm" and need not show that he suffered actual harm to prevail on his claim that Defendants deprived him of nourishment. (*Id.*, p. 5.) To the contrary, under *Plumeau*, "the extent of harm inflicted" is one of the four factors that must be considered for any claim that one's right to refuse medical treatment was violated. Similarly, Plaintiff submits neither evidence nor argument on the final *Plumeau* element to show whether the action enforcing the policy of which he complains was "taken in good faith or for the purpose of causing harm."

Defendants' evidence reveals that the blood sugar test requirement for receipt of a cold sack meal was implemented in good faith to prevent Plaintiff's blood sugar from reaching dangerous levels. Plaintiff presents no evidence to the contrary. Thus, Plaintiff fails to establish that a genuine issue as to any material fact exists that the policy which prohibited his receipt of a cold sack meal if he refused to submit to his blood-sugar checked violated his right to refuse medical treatment. *Matsushita,* 475 U.S. at 586.

### 2. Alternative Food Sources

Williams also contends that the other food sources Defendants identify as available in March of 2015, are immaterial because the state is required to feed him. (Doc. 40, p. 3.) Williams contends that Defendants' argument that he could have shown his ID and eaten in the PDR is circuitous because that policy indicates that Williams would receive a cold sack meal if he did not show his ID card. (*Id.*, pp. 3-4.) Williams' argument glosses over Defendants' evidence that, analogous to *Talib*, Williams in effect held the keys to the kitchen cupboard, but chose not to unlock it by simply showing his ID to receive food in the PDR.

Williams testified at his deposition that he was free to go to the PDR whenever he wanted and it was up to him whether to go. (SUF 39.) According to the psychiatric technicians' notes, Williams did not show up at the PDR for lunch or breakfast on March 6, 2015, and March 9,

2015. (SUF 40.) Moreover, Williams' testified that when he went to the PDR, the sole reason he was unable to obtain a meal was his refusal to show his ID; the PDR staff never asked him to do a blood sugar level check. (SUF 41.) However, Plaintiff did not bring his ID with him to the PDR, and refused when the servers asked him to show his ID. (SUF 42.)

The psychiatric technicians' notes also reflect that Williams refused to show his ID at the PDR on March 5, 2015, March 8, 2015, and March 10, 2015. (SUF 43.) Defendants' evidence therefore reveals that Williams always had access to meals at the PDR, without being required to submit to blood sugar level testing, but simply refused to comply with hospital procedures of showing his ID to obtain food there. Defendants' evidence also reveals that Williams' refusal was solely based on his personal belief that he should not be required to show his ID to obtain food. (SUF 44.) Defendants' evidence shows that Williams was not justified in refusing to comply with the hospital's policy which required showing an ID at the PDR to account for meals and ensure appropriate diet requirements were met, as medically ordered. (SUF 11.)

In sum, the evidence presented by Defendants reveals that food, free of cost, was always available to Plaintiff at the PDR, but that Plaintiff chose not to show his ID to obtain it. Given Defendants' evidence and the complete lack of evidence to the contrary, the Court finds that Williams, like *Talib*, carried the keys to the kitchen cupboard, but chose not to unlock it. This Court likewise declines to intervene in Williams' personal decision, and cannot find fault in Defendants for Plaintiff's choice.

Based on the foregoing, Defendants are entitled to summary judgment since, even drawing all inferences in the light most favorable to him, Williams fails to demonstrate "the existence of genuine issues for trial." *In re Oracle Corp.,* 627 F.3d at 387 (citing *Celotex Corp.,* 477 U.S. at 323). Defendants' request for qualified immunity need not be reached since they are entitled to summary judgment on the merits of Plaintiff's claim.

/ / /
/ / /
/ /
/ /

## **ORDER**

The Court finds that Defendants have met their burden on moving for summary judgment and Plaintiff has not established a dispute of material fact to defeat Defendants' motion.

Accordingly, it is **HEREBY ORDERED**:

(1) that Defendants Christopher DeLeon, Wendy Perez, Kenneth Underwood, and Ian Young are entitled to judgment as a matter of law, and their Motion for Summary Judgment, filed on February 26, 2018 (Doc. 38), is **GRANTED**; and

(2) the Clerk of the Court is directed to enter judgment against Plaintiff and for Defendants, and to close this action.

IT IS SO ORDERED.

Dated: __**September 10, 2018**__  /s/ *Sheila K. Oberto*
UNITED STATES MAGISTRATE JUDGE